[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10–11733

_____



FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 7, 2012
JOHN LEY
CLERK

D.C. Docket No. 1:08-cv-02278-JEC

MARCIA WALDEN,

Plaintiff - Appellant,

versus

CENTERS FOR DISEASE CONTROL AND PREVENTION,
COMPUTER SCIENCES CORPORATION,
CHRISTIE ZERBE,
Centers for Disease Control and Prevention Project Officer for
Occupational Health and Preventive Services,
in her individual and official capacities,
L. CASEY CHOSEWOOD,
Director of the Office of Health and Safety at the
Centers for Disease Control and Prevention,
in his individual and official capacities,

Defendants - Appellees,

JOHN DOE,
Centers for Disease Control and Prevention Official,
in his individual and official capacities,

Defendant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(February 7, 2012)

Before TJOFLAT, WILSON and SEYMOUR,[*] Circuit Judges.

SEYMOUR, Circuit Judge:

Marcia Walden brought this action against Computer Sciences Corporation ("CSC"), the Centers for Disease Control and Prevention ("CDC"), and two CDC employees, Dr. Casey Chosewood and Christie Zerbe. Ms. Walden alleged that all defendants violated her free exercise rights under the First Amendment and the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb *et seq*. She also alleged that CSC violated her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. The district court granted summary judgment in favor of all defendants on all claims. We affirm.

**I.**

CDC is a federal agency based in Atlanta, Georgia, where it has over 6,000

_____

[*] Honorable Stephanie K. Seymour, United States Circuit Judge for the Tenth Circuit, sitting by designation.

employees.  It maintains an Employee Assistance Program ("EAP"), which provides health and wellness services to its employees.

At all times relevant to this litigation, CSC administered CDC's EAP pursuant to a contract.  CSC managed and staffed the CDC clinics located in Atlanta, but CDC's approval was required for all EAP counselor positions.  Under the EAP contract, CDC could request the immediate removal of an EAP employee from the program.  Specifically, the contract stated:

> The Contracting Officer may . . . require the Contractor to immediately remove any contract employee from the on-site facility should it be determined that the individual who is being assigned to duty has been disqualified for suitability reasons, or who is found to be unfit for performing duties during their tour(s) of duty.

Rec., doc. 85-6 at 59.

In February 2006, CSC hired Ms. Walden to work as an EAP counselor at CDC.  Ms. Walden agreed to be bound by the EAP Guidelines and Procedures, which require that EAP services be made available to all CDC employees located at Atlanta area facilities "regardless of the nature of their personal or organizational issues related to work or life."  *Id.*, doc. 74-7 at 3.  CSC policies also required Ms. Walden to adhere to principles of inclusion and diversity.

Ms. Walden describes herself as "a devout Christian who believes that it is immoral to engage in same-sex sexual relationships."  *Id.*, doc. 1 at 1–2.  She

3

further believes that her religion prohibits her from encouraging or supporting same-sex relationships through counseling, meaning that she may not provide relationship counseling to individuals in same-sex relationships.

In July 2006, after referring a gay client to an outside counselor, Ms. Walden discussed the conflict between her religious beliefs and her job responsibilities with her supervisor, Gordon Hughes, who was also CSC's EAP director. According to Ms. Walden, Mr. Hughes stated that he was comfortable counseling gay clients, but provided no guidance with respect to how she should handle future conflicts created by her religious beliefs.

On August 21, 2007, Ms. Walden began an initial intake counseling session with a CDC employee, referred to herein as "Jane Doe." Ms. Doe told Ms. Walden she had been involved in a same-sex relationship for eighteen years, she and her partner were raising a son who was then eight years old, and her partner had forged Ms. Doe's name in order to obtain lines of credit. Ms. Doe was very upset and explained she did not know whether she could trust her partner again.

Concluding that Ms. Doe's need for same-sex relationship counseling conflicted with her religious beliefs, Ms. Walden told Ms. Doe that she could not provide her counseling because of Ms. Walden's "personal values." *Id.*, doc. 82 at 87. Ms. Walden explained:

> I looked at her, and I told her that I could see she was in pain, and I wanted to make sure she got help. But after hearing what she had to say, based on my personal values, I recognized I was not the best counselor for her. . . . I also told her that I realized that my personal values would interfere with our client/therapist relationship, and that wasn't fair to her.

*Id.* at 86–87. Ms. Walden did not say anything about her religion or religious beliefs to Ms. Doe and referred her to a colleague for counseling.

Ms. Doe was upset by how Ms. Walden had handled the intake session and referral. She felt "judged and condemned" by Ms. Walden's explanation for why she couldn't counsel her, and she also felt that Ms. Walden's nonverbal conduct communicated disapproval of her relationship. *Id.*, doc. 107 at 17–18. As a result, Ms. Doe contacted Mr. Hughes to complain about Ms. Walden's treatment of her.

Mr. Hughes subsequently discussed Ms. Doe's complaint with Ms. Walden. Through these discussions, Ms. Walden learned that Ms. Doe had complained about her and had called her homophobic. Ms. Walden reiterated to Mr. Hughes that she could counsel gay and lesbian individuals but her religious beliefs prohibited her from providing relationship counseling to individuals in same-sex relationships. In response, Mr. Hughes suggested that when Ms. Walden had such a conflict in the future, she could tell a client seeking same-sex relationship advice that she was inexperienced with relationship counseling, rather than stating that

5

her personal values required her to refer the client to a colleague. Ms. Walden refused to use this approach, and told him, "I couldn't say that I don't have relationship experience, because I would be lying to the client." *Id.*, doc. 82 at 101. Mr. Hughes made this proposal to Ms. Walden several times in subsequent discussions, but Ms. Walden continued to reject this alternative approach as dishonest. Neither she nor Mr. Hughes ever suggested other possible approaches. Through later discussions with several ministers, she ultimately decided she could perhaps tell clients like Ms. Doe, "I don't have experience in this matter," or "I'm not experienced in gay relationships." *Id.* at 111. But she never mentioned these alternatives to CSC. When Ms. Walden was asked in her deposition how she could have used this alternative approach, she explained:

> You asked me the question of whether or not I could say whether I had experience, or – to refer someone because I wasn't an expert in a particular matter.
> Most likely, the client would follow up with the question, asking me, "Well, what matter?" And then I would be led to say it, that, "It's . . . because I'm not experienced in gay/lesbian relationship counseling."

*Id.* at 115.

Mr. Hughes notified Doug Shelton, CSC's program manager who oversaw the company's contract with CDC, about Ms. Walden's referral of Ms. Doe and Ms. Doe's complaint. Mr. Shelton then contacted Dr. Chosewood, CDC's

6

Director of Health and Safety, and advised him that he "should be aware of a situation where Ms. Walden had told one of our CDC workers that she would not be able to counsel her because of her religious objections to the patient's issues around her same-sex relationship." *Id.*, doc. 108 at 24. Mr. Shelton added that "the employee was quite upset about that fact." *Id.* Mr. Shelton assured Dr. Chosewood that CSC would investigate the matter and that he would follow up with more information.

While Dr. Chosewood understood that it might be necessary and appropriate for counselors to make referrals due to religious conflicts, he was concerned about the manner in which Ms. Walden had stated her objections to Ms. Doe's life in connection with her referral. Dr. Chosewood told Ms. Zerbe, the CDC project officer responsible for managing the EAP contract, what had occurred. Ms. Zerbe agreed that referrals might be necessary where a counselor confronted a religiously-based conflict, but she feared that Ms. Walden's approach to referring Ms. Doe could undermine the EAP program's effectiveness. She was also upset that an individual seeking counseling "was made to feel worse" as a result of how Ms. Walden handled the situation. *Id.*, doc. 109 at 89.

Mr. Shelton asked Jackie Byrum, a CSC employee relations specialist, to investigate the incident. During her investigation, Ms. Byrum spoke with Ms.

7

Walden and asked her the same questions that Mr. Hughes had asked, including whether she would be willing to tell clients that her need to refer arose out of a lack of experience with relationship counseling. Ms. Walden again replied that she could not lie to her clients. Ms. Byrum told Ms. Walden, "[S]ometimes you have to set aside your religious beliefs in the interest of the client." *Id.*, doc. 82 at 121. Ms. Byrum concluded from her discussions with Ms. Walden that it was not an option for Ms. Walden "[t]o not disclose her religious and personal beliefs because she felt that . . . would be dishonest."[1] *Id.*, doc. 106 at 62.

While Ms. Byrum's investigation was still ongoing, Mr. Shelton followed up with Dr. Chosewood. Mr. Shelton advised him that although CSC had spoken to Ms. Walden about referring employees without specifically mentioning her religious objections or personal values, Ms. Walden "was not willing to change the way she approached future situations." *Id.*, doc. 108 at 31. Dr. Chosewood was surprised that Ms. Walden was unwilling to change her approach. He told Mr. Shelton that he was concerned about Ms. Walden's behavior, which he feared would lead to similar incidents in the future.

---

[1] In resolving the defendants' motions for summary judgment, the district court assumed that Ms. Walden did not insist on disclosing her religious beliefs to future clients, as opposed to her "personal values" or "personal beliefs." The district court instead assumed that Ms. Byrum reached her conclusion because Ms. Walden repeatedly refused to say that she was inexperienced in relationship counseling.

8

Following this conversation, and before CSC had completed its investigation, Dr. Chosewood and Ms. Zerbe jointly decided to ask that Ms. Walden be removed from the EAP contract, believing that Ms. Walden "wasn't willing to alter her approach." *Id.* at 33. On August 30, Ms. Zerbe sent an email to Mr. Shelton asking for Ms. Walden's removal from the contract.

As required by the contract, CSC complied with CDC's request and removed Ms. Walden from the EAP. Mr. Shelton informed Ms. Walden she was being laid off from her counseling job at CDC's request. Because she was laid off rather than terminated for cause, CSC provided Ms. Walden with resources to help her find another job within the company. Specifically, her layoff letter encouraged her to "seek other opportunities within CSC by using CSC CareerSource and the Employee Reassignment Service." *Id.*, doc. 85-33 at 2. The layoff designation allowed Ms. Walden to retain her tenure with CSC if she found a new position with CSC within one year. At the time, CSC's only counseling positions in the Atlanta area were the EAP positions at CDC, although positions were available in other cities. Ms. Walden logged onto CSC's website at least once to see if there were job openings, but she did not apply for a new position.

Ms. Walden filed this action in July 2008 against CSC, CDC, Ms. Zerbe, and an unidentified CDC official, asserting four claims against all defendants – a

9

free exercise claim, a free exercise retaliation claim, a free speech retaliation claim, and a RFRA claim. Ms. Walden also asserted a due process claim against CDC, Ms. Zerbe, and the unidentified CDC official, and a Title VII religious discrimination claim against CSC. She subsequently amended her complaint to substitute Dr. Chosewood for the previously-unidentified defendant. With respect to all of her claims, she sought damages as well as declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.

Following discovery, the parties filed cross-motions for summary judgment. In its motion, CDC argued that an action for monetary damages arising from constitutional violations and based on *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999 (1971), does not lie against a federal agency. *See FDIC v. Meyer*, 510 U.S. 471, 484–86, 114 S. Ct. 996, 1005–06 (1994). In response, Ms. Walden stated that she did not intend to pursue any claims for monetary damages against CDC or against Dr. Chosewood and Ms. Zerbe in their official capacities. Ms. Walden also expressly abandoned her free exercise retaliation claim against CSC, her free speech retaliation claim, and her due process claim.

The magistrate judge proposed in a report and recommendation that the district court grant defendants' motions for summary judgment. The district court

agreed and dismissed Ms. Walden's claims.  Ms. Walden now appeals.

## II.

We review the district court's decision de novo, viewing the evidence in the light most favorable to Ms. Walden and drawing all inferences in her favor. *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010).  Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  We may affirm the district court's grant of summary judgment on any legal ground supported by the record, regardless of whether the district court relied on that ground.  *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir. 1994).

### A.  Claims Against CDC and Against Dr. Chosewood and Ms. Zerbe in Their Official Capacities

Although Ms. Walden abandoned her claims for monetary damages against CDC and against Dr. Chosewood and Ms. Zerbe in their official capacities, on appeal she claims a right to seek declaratory relief under 28 U.S.C. § 2201 against these defendants for allegedly violating her rights under the Free Exercise Clause

11

and RFRA. *See* Aplt. Reply Br. at 18. We hold that she lacks standing to do so.[2]

The Declaratory Judgment Act, 28 U.S.C. § 2201, "echoing the 'case or controversy' requirement of [A]rticle III of the Constitution, provides that a declaratory judgment may only be issued in the case of an 'actual controversy.'" *Emory v. Peeler*, 756 F.2d 1547, 1551–52 (11th Cir. 1985). "That is, under the facts alleged, there must be a substantial continuing controversy between parties having adverse legal interests." *Id.* at 1552. "In order to demonstrate that a case or controversy exists to meet the Article III standing requirement when a plaintiff is seeking injunctive or declaratory relief, a plaintiff must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future." *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1346 (11th Cir. 1999) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S. Ct. 1660, 1665 (1983)). "Injury in the past . . . does not support a finding of an Article III case or

---

[2] In proceedings below, neither the magistrate judge nor the district court determined whether Ms. Walden had standing to seek declaratory relief under 28 U.S.C. § 2201 against CDC or against Dr. Chosewood and Ms. Zerbe in their official capacities. "Although neither side raises the issue here, we are required to address the issue even if the courts below have not passed on it, and even if the parties fail to raise the issue before us. The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of [the jurisdictional] doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230–31, 110 S. Ct. 596, 607 (1990) (citations and internal quotation marks omitted) (alteration in original); *see also Arnold v. Martin*, 449 F.3d 1338, 1341 (11th Cir. 2006) (per curiam) ("Precedent obligates us to determine on our own initiative whether [the plaintiff] has standing.").

12

controversy when the only relief sought is a declaratory judgment." *Id.* at 1348.

In this case, Ms. Walden's claims for declaratory relief against CDC, and against Dr. Chosewood and Ms. Zerbe in their official capacities, only seek relief for a past injury. She does not allege that her religious rights continue to be burdened or are likely to be burdened in the future. A declaration that these defendants violated her rights in the past under the First Amendment and RFRA "would [be] nothing more than a gratuitous comment without any force or effect." *Id.* (alteration in original) (citation and internal quotation marks omitted). Thus, Ms. Walden fails to satisfy the "case or controversy" requirement of Article III and the "actual controversy" requirement of 28 U.S.C. § 2201. Accordingly she cannot seek declaratory relief against CDC or against Dr. Chosewood and Ms. Zerbe in their official capacities.

### B. Claims Against Dr. Chosewood and Ms. Zerbe in Their Individual Capacities

We analyze Ms. Walden's claims against Dr. Chosewood and Ms. Zerbe in their individual capacities under the framework of qualified immunity.[3] "The

---

[3] Ms. Walden's First Amendment claims against Dr. Chosewood and Ms. Zerbe seek damages pursuant to *Bivens*, 403 U.S. 388, 91 S. Ct. 1999. In many respects, "[a] *Bivens* action is analogous to § 1983 suits against state and local officers." *Smith ex rel. Smith v. Siegelman*,

(continued...)

13

doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)). The defense of qualified immunity applies not only to constitutional claims, but also to claims brought for alleged violations of RFRA. *See, e.g.*, *Rasul v. Myers*, 563 F.3d 527, 533 n.6 (D.C. Cir. 2009) (per curiam) (holding, in the alternative, that federal officials were entitled to qualified immunity against claims brought for violations of RFRA); *cf. Tapley v. Collins*, 211 F.3d 1210, 1214 (11th Cir. 2000)

---

[3](...continued)
322 F.3d 1290, 1297 n.15 (11th Cir. 2003). In *Bivens*, the Supreme Court held that a plaintiff could bring a suit for damages against federal officials for violations of the plaintiff's Fourth Amendment rights. 403 U.S. at 397, 91 S. Ct. at 2005. The Supreme Court has extended *Bivens* to allow damages actions under the Eighth and Fifth Amendments. *See Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468 (1980); *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264 (1979). Since *Carlson*, however, the Court has repeatedly declined to imply a *Bivens* remedy in a variety of contexts. *See, e.g.*, *Minneci v. Pollard*, 10-1104, ___ S. Ct. ____, 2012 WL 43511, at *5–6 (Jan. 10, 2012) (collecting and summarizing cases). The Court has "rejected the claim that a *Bivens* remedy should be implied simply for want of any other means for challenging a constitutional deprivation in federal court." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 69, 122 S. Ct. 515, 520 (2001). Because of our disposition of this case on other grounds, we need not decide whether a *Bivens* claim is appropriate here. We therefore only assume without deciding that Ms. Walden may seek a *Bivens* remedy for violations of the First Amendment's Free Exercise Clause. *See Ashcroft v. Iqbal*, 556 U.S. 662, ___, 129 S. Ct. 1937, 1948 (2009) (assuming, without deciding, that a First Amendment Free Exercise Clause claim is actionable under *Bivens*). *But see Bush v. Lucas*, 462 U.S. 367, 388–90, 103 S. Ct. 2404, 2416–17 (1983) (declining to create a *Bivens* remedy against a federal official for a First Amendment violation arising in the context of federal employment where administrative remedies existed).

14

("[T]he Supreme Court has said that the defense of qualified immunity is so well established, that if Congress wishes to abrogate it, Congress should specifically say so."); *id.* at 1215 n.9 (collecting cases holding that qualified immunity is a defense to claims arising under various federal statutes).

We apply a two-prong test for determining whether an official is entitled to qualified immunity. "First, a plaintiff must show that a constitutional or statutory right has been violated. Second, a plaintiff must show that the right violated was clearly established." *Fennell v. Gilstrap*, 559 F.3d 1212, 1216 (11th Cir. 2009) (per curiam). Courts have discretion as to the order in which they address these two prongs. *Pearson*, 555 U.S. at 236, 129 S. Ct. at 818.

*1. Free Exercise*

Ms. Walden contends the request by Dr. Chosewood and Ms. Zerbe that CSC remove her from the EAP contract infringed on her right to free exercise of her religion in violation of the First Amendment. She disputes the district court's holding that she failed to raise a genuine fact issue regarding whether Dr. Chosewood or Ms. Zerbe removed her because of her religious need to refer clients seeking same-sex relationship counseling to another counselor. She also argues they did not engage in a reasonable investigation or act in good faith before asking CSC to remove her from the EAP contract.

15

When the government acts as an employer, it has far broader powers than the government acting as sovereign. *Shahar v. Bowers*, 114 F.3d 1097, 1110 (11th Cir. 1997) (en banc). This is so because the government "has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 1734 (1968). "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S. Ct. 1951, 1958 (2006) (citing *Connick v. Myers*, 461 U.S. 138, 143, 103 S. Ct. 1684, 1688 (1983)). Consequently, the government has "broad discretion" to make employment decisions. *Boyce v. Andrew*, 510 F.3d 1333, 1341 (11th Cir. 2007) (per curiam). This discretion applies not only to the government's relationships with its employees, but also to its relationships with independent contractors. *See Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 673, 116 S. Ct. 2342, 2346 (1996) (extending *Pickering* to independent contractors); *Shahar*, 114 F.3d at 1102–03 (recognizing *Umbehr* held that *Pickering* provides "the appropriate standard" for determining whether a government contractor's free speech rights were violated). As such, "absent contractual, statutory, or

constitutional restriction, the government is entitled to terminate [employees and contractors] for no reason at all." *Umbehr*, 518 U.S. at 674, 116 S. Ct. at 2347.

Nevertheless, where an employee or contractor's free exercise rights are a substantial or motivating factor in her termination, we evaluate her claim under the balancing test originally provided in *Pickering*, 391 U.S. at 568, 88 S. Ct. at 1734. *Shahar*, 114 F.3d at 1111 n.27. That is, we balance the First Amendment rights of the employee or contractor against the interests of the government "as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S. Ct. at 1734–35.

We accept that Ms. Walden's sincerely held religious beliefs prohibit her from encouraging or supporting same-sex relationships through counseling. There is no need to engage in the *Pickering* balancing test here, however, because Ms. Walden cannot point to any evidence that Dr. Chosewood or Ms. Zerbe "burdened one of [her] 'sincerely held religious beliefs.'" *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1294 (11th Cir. 2007) (quoting *Frazee v. Ill. Dep't of Emp't Sec.*, 489 U.S. 829, 834, 109 S. Ct. 1514, 1517 (1989)). The record is devoid of evidence supporting Ms. Walden's claim that either defendant called for her removal from the EAP contract due to her religiously-based need to refer clients who needed same-sex relationship counseling.

17

Instead, the record is clear that Dr. Chosewood and Ms. Zerbe removed Ms. Walden because of the manner in which she handled Ms. Doe's referral, and because they were concerned that she would behave the same way if a similar situation were to arise in the future. And, significantly, Ms. Walden testified that it was *not* part of her "religious beliefs" to *tell* clients, including Ms. Doe, that she could not counsel them due to her religious beliefs or personal values. Instead, she said she wanted "to be honest with my clients." Rec., doc. 82 at 291–92. She further explained that "it seemed unfair that [Ms. Doe] was able to talk about being gay and lesbian, and yet I couldn't freely talk about me and my religious beliefs, or being Christian . . . . To me, it's about honesty. If she can be honest – I mean, I should be honest about why I'm transferring her." *Id.* at 311–12.

Dr. Chosewood testified that he disapproved of how Ms. Walden handled Ms. Doe's referral. He explained that merely referring Ms. Doe due to Ms. Walden's religious conflict "would not have been problematic at all, but sharing her objections to this patient's circumstances, her life, I felt was inappropriate." *Id.*, doc. 108 at 27. When asked whether it would have been appropriate for Ms. Walden to state, "Based on my personal beliefs, I don't feel I'm the best counselor for you," Dr. Chosewood replied:

> There again, I feel like that statement has some – has some bias

18

in it, it has some judgmental tone in it. There are many people who believe that homosexuality is like eye color or color of skin, you know. There's good science that supports that, as well. I would not be happy with her saying something like, you know, "My personal belief doesn't allow me to see someone of your color." To me, that's – it's just not appropriate in that very vulnerable setting when patients are coming to you maybe at their neediest time.

So I feel like a referral, perfectly fine. And – but to share, to give any, really, sort of expression of judgment or of displeasure with someone else's situation or choices or life, to me, is not – it does not further the therapeutic relationship in any way.

*Id.* at 37–38. Dr. Chosewood also emphasized that:

as the director of the [CDC's] Office of Health and Safety, I felt a responsibility to provide a high-quality, welcoming environment for any of CDC's workers who might come forward. I think that's especially true in the first intake session when the provider is unsure of where an employee might be in a situation, how vulnerable they might be, how much difficulty or struggle they might be having with a situation, what their frame of mind, their mental state is. That's a particularly sensitive and vulnerable period in the client/provider relationship, and I would hope that our program would be at its best during that window. And certainly, I felt that was falling short of that expectation of a high-quality program.

*Id.* at 25–26.

Ms. Zerbe agreed with Dr. Chosewood's assessment. She concluded that Ms. Walden's handling of the referral was "an unacceptable reaction to the situation" and explained:

[A]n individual coming in for counseling is already at a hypersensitized state. [Ms. Doe] was made to feel worse coming in to – for counseling. And that was done by letting the individual – by

19

Marcia Walden judging the individual as opposed to simply referring her to another counselor.

*Id.*, doc. 109 at 89.

Dr. Chosewood and Ms. Zerbe were both concerned that Ms. Walden would react in a similarly inappropriate manner when confronted with future clients seeking same-sex relationship counseling. Dr. Chosewood testified that he had "continuing concerns over [Ms. Walden's] behavior . . . and certainly feared that it very likely could happen again." *Id.*, doc. 108 at 33. He also "began to worry about the overall fit of [Ms. Walden] within [CDC's] program, about the quality of service that she would be providing . . . ." *Id.* Ms. Zerbe explained that CDC "did not want any individual coming in for counseling to second-guess coming in for counseling." *Id.*, doc. 109 at 89–90.

Ms. Walden does not dispute that Dr. Chosewood and Ms. Zerbe testified about these concerns but contends that other statements show they removed her due to her religiously-based need to refer clients seeking same-sex relationship counseling. We do not agree.

First, Ms. Walden contends Ms. Zerbe testified that "Walden was unable to fulfill the requirements of the EAP contract because of her need to refer Ms. Doe when she sought counseling." Aplt. Br. at 46. Ms. Zerbe did, in fact, state that

20

Ms. Walden was not able to fulfill the contract requirements due to the fact that "[s]he was unable to counsel a CDC worker that came in for counseling." Rec., doc. 109 at 56. In the course of the same discussion, however, she also made clear her view that it is appropriate for a counselor to refer a client to another counselor if she "could not, based on personal religious beliefs, counsel the individual." *Id.* at 58. She went on to explain that CDC asked Ms. Walden to be removed because of *the manner* in which she handled Ms. Doe's referral, and because they feared she would handle future referrals in a similar way.

Second, Ms. Walden points to testimony by Ms. Zerbe and Dr. Chosewood which, she argues, displays their concern that Ms. Walden's religious and personal beliefs might prevent her from counseling CDC employees about other issues. But Ms. Walden has taken these statements out of context. Ms. Zerbe explained:

> We did not know if this would be the only time she would not be able to counsel an individual based on her religious and personal beliefs. We have a very broad demographic in employee schematic, people that are Islamic, people that were Muslim, people – we did not know where that was going to lie. And if she was going to [imply] why she did it to each person that came in, we thought that would damage the EAP program.

*Id.* at 90. As this statement makes clear, Ms. Zerbe was not concerned about the referrals themselves, but rather that Ms. Walden would convey in an unacceptable manner her reason for future referrals. Similarly, Dr. Chosewood had "continuing

21

concerns over [Walden's] behavior," and he "feared that it very likely could happen again." *Id.*, doc. 108 at 33. It is apparent from his testimony that his concern was that Ms. Walden would continue to make personal, judgmental comments to clients in connection with future referrals.

Ms. Walden relies on *Waters v. Churchill*, 511 U.S. 661, 114 S. Ct. 1878 (1994), to argue that Dr. Chosewood and Ms. Zerbe acted unreasonably by asking that she be removed from the EAP contract without first conducting their own investigation into the incident with Ms. Doe. In her view, the information upon which they relied was erroneous and they would have learned that she was willing to alter her approach to referrals in the future had they conducted a reasonable investigation.

The Court held in *Waters* that when a court must engage in *Pickering*'s balancing test and weigh the government's interests against the First Amendment interests of the employee, it should "look to the facts as the employer *reasonably* found them to be." *Id.* at 677, 114 S. Ct. at 1889 (plurality opinion).[4] That is, when there are conflicting accounts of the employee's speech or conduct, the court

_____

[4] Although the plurality opinion in *Waters* garnered only four votes, "[a] majority of the Court agree[d] that employers whose conduct survives the plurality's reasonableness test cannot be held constitutionality liable (assuming the absence of pretext) . . . ." *Waters*, 511 U.S. at 685, 114 S. Ct. at 1893 (Souter, J., concurring).

22

should consider the employee's behavior as the government believed it to be, so long as that belief was reasonable. *See id.*; *see also Salge v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 185 (5th Cir. 2005). The reasonableness of the government's understanding of events will often turn on the procedures it used to investigate the employee's speech or conduct. *See Waters*, 511 U.S. at 678, 114 S. Ct. at 1889 (plurality opinion).

But Ms. Walden's reliance on *Waters* is misplaced. In *Waters*, "unlike the instant case, the difference between the two versions of the employee's speech was determinative, as one version implicated protected speech and the other did not." *Salge*, 411 F.3d at 185. Here, in contrast, even under Ms. Walden's version of events, the behavior for which she was discharged – the manner in which she referred Ms. Doe – was not protected conduct under the Free Exercise Clause. This is so because Ms. Walden's religious beliefs did not require her to tell Ms. Doe the reason for the referral. Because Ms. Walden's free exercise rights were not implicated by her removal from the EAP contract, we do not reach *Pickering*'s balancing test and *Waters* is inapposite.

Even if *Waters* were applicable, however, we would agree with the district court that Dr. Chosewood and Ms. Zerbe acted reasonably in relying on CSC, and Mr. Shelton in particular, to obtain information about Ms. Walden's referral of

23

Ms. Doe and about how she would handle future referrals. We have previously explained that a government employer may rely on investigations by trusted third parties or subordinates in making employment decisions. *See Shahar*, 114 F.3d at 1106 n.18 (concluding Attorney General did not act unreasonably in relying on information provided by his staff or in acting without having personally spoken with plaintiff). Similarly, it was reasonable for Dr. Chosewood and Ms. Zerbe to rely on information provided by Ms. Walden's actual employer about its investigation to conclude that Ms. Walden should be removed from the EAP contract. Dr. Chosewood received two updates from CSC about Ms. Walden. First, Mr. Shelton advised Dr. Chosewood that he "should be aware of a situation where Ms. Walden had told one of our CDC workers that she would not be able to counsel her because of her religious objections to the patient's issues around her same-sex relationship. And that the employee was quite upset about that fact." Rec., doc. 108 at 24. Mr. Shelton also told Dr. Chosewood that CSC was going to investigate the situation, and that he would follow up with more information. Second, during the course of Ms. Byrum's investigation, Mr. Shelton informed Dr. Chosewood that CSC had spoken with Ms. Walden and discussed methods for referring employees without reference to her religious objections or personal values, but Ms. Walden was unwilling to modify her approach to handling

24

referrals in the future.

Ms. Walden contends she did not, in fact, insist upon voicing her objections to same-sex relationships in connection with future referrals. Instead, she merely refused to state that she did not have experience in relationship counseling when referring clients. But she also did not volunteer an alternative approach to future referrals. Although CDC could have engaged in an independent investigation, its decision not to do so was nonetheless reasonable under the *Waters* standard. Because Dr. Chosewood and Ms. Zerbe did not violate Ms. Walden's free exercise rights, they are entitled to qualified immunity.

## 2. Free Exercise Retaliation

Ms. Walden also maintains that by requesting CSC to remove her from the EAP contract, Dr. Chosewood and Ms. Zerbe retaliated against her for engaging in constitutionally protected activity, that is, her decision to refer Ms. Doe because of her religious beliefs. The district court held that Ms. Walden had not made out a prima facie case of free exercise retaliation. Ms. Walden contends the district court erred in dismissing her claim.

In order to establish a prima facie case of First Amendment retaliation, Ms. Walden must show that she engaged in constitutionally protected activity and that the protected conduct played a "substantial or motivating role" in the alleged

adverse employment action. *Akins v. Fulton Cnty.*, 420 F.3d 1293, 1303 (11th Cir. 2005) (citing *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989)). If Ms. Walden made this showing, the burden would then shift to Dr. Chosewood and Ms. Zerbe to prove that they would have taken the same action absent the protected conduct. *Id.*

Ms. Walden did not establish a prima facie case of retaliation because she failed to provide evidence that her religiously-based need to refer Ms. Doe was a "substantial or motivating" factor in Dr. Chosewood and Ms. Zerbe's decision to have her removed from the EAP contract. As discussed above, undisputed facts in the record show that Dr. Chosewood and Ms. Zerbe asked for Ms. Walden's removal from the contract because of how she handled Ms. Doe's referral and because they believed Ms. Walden would not alter her behavior in similar circumstances in the future, not because of her religious views or her need to refer clients for religious reasons.

Ms. Walden argues that she raised a genuine fact issue as to causation by showing a close temporal proximity of three weeks between her protected activity and Dr. Chosewood and Ms. Zerbe's adverse employment action. *See, e.g.*, *Stanley v. City of Dalton*, 219 F.3d 1280, 1291 & n.20 (11th Cir. 2000) (listing temporal proximity as among the factors relevant for showing causation). But this

26

showing of temporal proximity is not sufficient to negate the evidence showing that Ms. Walden was removed for her approach to making referrals and not for her need to make referrals for religious reasons. *Cf. Wascura v. City of S. Miami*, 257 F.3d 1238, 1247 (11th Cir. 2001) (holding, in context of ADA claim, that where ample legitimate reasons supported a termination decision, temporal proximity alone was insufficient to meet plaintiff's burden of showing employer's articulated reasons for termination was pretextual).

Ms. Walden has not provided evidence that Dr. Chosewood and Ms. Zerbe requested her removal from the EAP in retaliation of her free exercise rights. Because she failed to show that her constitutional right was violated, Dr. Chosewood and Ms. Zerbe are entitled to qualified immunity.

*3. RFRA*

Under RFRA, "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability . . . ." 42 U.S.C. § 2000bb-1(a).[5] However, the government "may substantially burden a person's exercise of religion" if the challenged action "is in furtherance of a compelling governmental interest" and "is the least restrictive

---

[5] RFRA has been held unconstitutional as applied to states. *See City of Boerne v. Flores*, 521 U.S. 507, 117 S. Ct. 2157 (1997).

means of furthering that compelling governmental interest." *Id*. § 2000bb-1(b). The statute defines "government" to include agencies and officials of the United States. *Id*. § 2000bb-2(1).[6]

Ms. Walden's RFRA claim against Dr. Chosewood and Ms. Zerbe fails for the same reason that her free exercise claim fails: Their decision to ask for Ms. Walden's removal from the EAP contract did not "substantially burden" her need to refer clients seeking same-sex relationship counseling due to her religious beliefs. *See* 42 U.S.C. § 2000bb-1(a). On this record, no reasonable juror could conclude that their decision was based on Ms. Walden's religious objections to counseling clients in same-sex relationships, rather than the manner in which Ms. Walden handled Ms. Doe's referral and their understanding that Ms. Walden would not alter her behavior in connection with future referrals. Because Dr.

---

[6] Congress passed RFRA in response to *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S. Ct. 1595 (1990), which Congress found "virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion." 42 U.S.C. § 2000bb(a)(4). RFRA's stated purpose was "to restore the compelling interest test" provided in *Sherbert v. Verner*, 374 U.S. 398, 83 S. Ct. 1790 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205, 92 S. Ct. 1526 (1972), "where free exercise of religion is substantially burdened" by government. 42 U.S.C. § 2000bb(b)(1).

In proceedings below, the magistrate judge determined that in light of Congress's intent to use RFRA to restore the law to its pre-*Smith* state, RFRA's heightened compelling interest standard was inapplicable to a government employer. It reasoned that even before *Smith*, *Pickering*'s balancing test, rather than *Sherbert*'s compelling interest standard, applied when the government burdened the First Amendment rights of one of its employees.

The district court declined to resolve whether RFRA applies to the government when it acts as an employer rather than as sovereign, as do we. Notably, the government does not argue that RFRA is inapplicable. We therefore assume RFRA applies here.

28

Chosewood and Ms. Zerbe did not violate Ms. Walden's statutory right under RFRA, they are entitled to qualified immunity.

### C.  Claims Against CSC

Ms. Walden maintains that CSC's action in removing her from her position infringed on her religious rights in violation of the Free Exercise Clause of the First Amendment, RFRA, and Title VII.  We address each argument in turn.

*1. Free Exercise*

Ms. Walden seeks monetary damages against CSC for allegedly violating her First Amendment free exercise rights by removing her from her position. Neither Ms. Walden nor CSC cites the Supreme Court's decision in *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 122 S. Ct. 515 (2001), but under this decision, Ms. Walden's claim is foreclosed.

In *Malesko*, the Supreme Court refused to extend *Bivens* to allow an action against a private corporation operating under a contract with the federal government.  The Court explained, "The purpose of *Bivens* is to deter *individual federal officers* from committing constitutional violations. . . . [T]he threat of suit against an *individual's employer* was not the kind of deterrence contemplated by *Bivens*."  *Id*. at 70, 122 S. Ct. at 521 (citing *FDIC v. Meyer*, 510 U.S. 471, 485,

29

114 S. Ct. 996, 1005 (1994)) (emphasis added). Thus, "if a corporate defendant is available for suit, claimants will focus their collection efforts on it, and not the individual directly responsible for the alleged injury." *Id*. at 71, 122 S. Ct. at 521; s*ee also Meyer*, 510 U.S. at 485, 114 S. Ct. at 1005 ("If we were to imply a damages action directly against federal agencies, . . . there would be no reason for aggrieved parties to bring damages actions against individual officers. . . . [T]he deterrent effects of the *Bivens* remedy would be lost.").

Ms. Walden has alleged a constitutional tort claim against CSC, a private corporate entity acting under contract with the federal government. And we see no meaningful distinction between *Malesko* and Ms. Walden's suit that would warrant departing from the Supreme Court's clear holding that foreclosed "inferring a constitutional tort remedy against a private entity." *Malesko*, 534 U.S. at 71, 122 S. Ct. at 521. Under *Malesko*, Ms. Walden cannot bring a *Bivens* action against CSC.[7]

*2. RFRA*

We next turn to Ms. Walden's claim that CSC impermissibly burdened her free exercise rights under RFRA, 42 U.S.C. § 2000bb *et seq.*, when it removed her

---

[7] Ms. Walden also seeks a declaratory judgment against CSC. She lacks standing to do so for the reasons given in Part II.A. of our opinion.

30

from the EAP contract, laid her off, and then terminated her. Like the district court, we assume that CSC acted as an "instrumentality" of the federal government when it removed Ms. Walden from her position, and therefore may be subject to suit under RFRA. *See id.* § 2000bb-1(a) (imposing the obligations of RFRA upon the "Government"); *id.* § 2000bb-2(1) (defining "government" to include "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity"). We also agree with the district court that CSC did not "substantially burden" Ms. Walden's religious rights when it removed her from the EAP contract or when it subsequently laid her off.

The district court held that CSC's actions did not burden Ms. Walden's religious beliefs because it was CDC's request that she be removed from the EAP contract which necessitated her layoff. Ms. Walden contends she introduced sufficient evidence from which a reasonable jury could conclude that CSC removed her due to her religiously-based need to refer clients seeking same-sex relationship counseling, not just because they were required to. She asserts that several statements made by CSC employees prior to CDC's August 30 request to have her removed support her claim. For example, Mr. Hughes told Ms. Walden on August 22 that EAP counselors "needed to see everyone, . . . . were required to

31

see everyone, [and] could not refer people." Rec., doc. 102 at 68. Ms. Walden cites several other statements by CSC employees indicating they had concerns about Ms. Walden's ability to satisfy her job requirements.

Ms. Walden also points to actions that CSC employees took with respect to her employment. On August 22, for example, Mr. Shelton initiated a reduction in force ("RIF") action against Ms. Walden with CSC's human resources department, although the RIF was never implemented. Moreover, on August 24, CSC suspended Ms. Walden without pay.

Notwithstanding the statements and conduct by CSC's employees, CSC did not actually take Ms. Walden off the EAP contract until CDC asked for her removal on August 30. And, as we have held, Dr. Chosewood and Ms. Zerbe's request to remove Ms. Walden from the contract was not motivated by, and did not burden, her religious need to refer clients seeking same-sex relationship counseling. Once CDC made this request, CSC was contractually obligated to comply. Because CSC had no choice but to remove Ms. Walden from her counseling position, any other motivations CSC employees may have expressed are irrelevant to the removal decision. Consequently, no reasonable jury could find that CSC's action substantially burdened Ms. Walden's religious rights.

Nor could a reasonable jury find that CSC's subsequent decision to lay off

32

Ms. Walden substantially burdened her religious rights. The EAP positions at CDC were CSC's only counseling positions in the Atlanta area. Thus, once Ms. Walden was removed from the EAP contract, CSC had no counseling job to offer her. Rather than terminating her, CSC placed her in layoff status. Because CSC characterized Ms. Walden's layoff as resulting from a "client bar action," she was entitled to seek other employment opportunities within the company and would have retained her tenure as long as she found another position within one year. CSC provided Ms. Walden with access to internal career and employee reassignment services and encouraged her to seek other employment within the company. As a result of Ms. Walden's own decision not to seek other employment opportunities, her layoff became permanent.

Because CSC did not burden Ms. Walden's religious rights by removing her from the EAP contract or by ultimately terminating her employment, the district court properly granted summary judgment in favor of CSC on her RFRA claim.

3. *Title VII*

Ms. Walden also maintains that CSC discriminated against her in violation of Title VII when it removed her from her position. The district court held that Ms. Walden failed to establish a prima facie case of religious discrimination because she did not show that she was discharged for failing to comply with an

employment requirement that conflicted with her religious beliefs. The court also determined that even assuming Ms. Walden could establish a prima facie case, her Title VII claim still failed because CSC had provided her with a reasonable accommodation as a matter of law, and because Ms. Walden failed to make a good faith attempt to accommodate her religious needs through the means offered by CSC.

Title VII makes it unlawful for an employer to discharge an employee on the basis of the employee's religion. 42 U.S.C. § 2000e-2(a)(1). "Religion" is defined to include "all aspects of religious observance and practice, as well as belief." *Id.* § 2000e(j). An employer has a "statutory obligation to make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75, 97 S. Ct. 2264, 2272 (1977).

In religious accommodation cases, we apply a burden-shifting framework akin to that articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973). Under this framework, the plaintiff must first establish a prima facie claim by presenting "evidence sufficient to prove that (1) [she] had a bona fide religious belief that conflicted with an employment requirement; (2) [she] informed [her] employer of [her] belief; and (3) [she] was discharged for failing to

34

comply with the conflicting employment requirement." *Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1321 (11th Cir. 2007). We are mindful that the plaintiff's burden of establishing a prima facie case in Title VII cases "is not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 1094 (1981). "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Id.* at 254, 101 S. Ct. at 1094. If the plaintiff establishes a prima facie case, "the burden shifts to the defendant to 'demonstrate[ ] that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.'" *Morrissette-Brown*, 506 F.3d at 1321 (quoting 42 U.S.C. § 2000e(j)) (alteration in original).

The parties agree that Ms. Walden satisfies the first two elements of her prima facie case. She held a bona fide religious belief that she could not provide relationship counseling to individuals in same-sex relationships, but EAP counselors were required to counsel all CDC employees on all issues. She also had informed her supervisor, Mr. Hughes, of this conflict. Even if we assume Ms. Walden has presented sufficient evidence to raise a genuine dispute of fact as to the third element of her prima facie case, however, her claim still must fail. CSC

35

provided Ms. Walden with a reasonable accommodation as a matter of law.

"[T]he precise reach of the employer's obligation to [reasonably accommodate] its employee is unclear under the statute and must be determined on a case-by-case basis." *Beadle v. Hillsborough Cnty. Sheriff's Dep't*, 29 F.3d 589, 592 (11th Cir. 1994). But "a reasonable accommodation is one that 'eliminates the conflict between employment requirements and religious practices.'" *Morrissette-Brown*, 506 F.3d at 1322 (quoting *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70, 107 S. Ct. 367, 373 (1986)). "[C]ompliance with Title VII does not require an employer to give an employee a choice among several accommodations; nor is the employer required to demonstrate that alternative accommodations proposed by the employee constitute undue hardship." *Beadle*, 29 F.3d at 592 (citing *Philbrook*, 479 U.S. at 68, 107 S. Ct. at 371). Instead, the employer must only show that the employee was offered a reasonable accommodation, "regardless of whether that accommodation is one which the employee suggested." *Id.* "[A]ny reasonable accommodation by the employer is sufficient to meet its accommodation obligation." *Philbrook*, 479 U.S. at 68, 107 S. Ct. at 372.

After CDC requested that Ms. Walden be removed from the EAP contract, CSC laid her off because it had no counseling positions available in the Atlanta

area. But CSC reasonably accommodated Ms. Walden when it encouraged her to obtain new employment with the company and offered her assistance in obtaining a new position. Because of Ms. Walden's laid off status, she would have retained her tenure had CSC rehired her within a year in another position. Although other positions were available, Ms. Walden did not apply for any of them. Ms. Walden's claim that CSC should have instead considered "the most obvious accommodation—transfer to a non-counseling position," Aplt. Br. at 40, is of no relevance here. CSC was only obligated to offer her some reasonable accommodation. It was not required to provide Ms. Walden with her preferred accommodation. *See Philbrook*, 479 U.S. at 68, 107 S. Ct. at 372 ("[W]here the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end. The employer need not further show that each of the employee's alternative accommodations would result in undue hardship.").

Our sister circuit reached a similar conclusion on facts strikingly similar to those here in *Bruff v. North Mississippi Health Services, Inc.*, 244 F.3d 495, 501 (5th Cir. 2001). In *Bruff,* the court held that the defendant hospital fulfilled its obligation to accommodate the plaintiff counselor's religiously-based refusal to provide same-sex relationship counseling when it gave her thirty days to find another position at the hospital and provided her with the assistance of its in-house

employment counselor. *Id*. at 502–03. There, as here, the employer encouraged its employee to seek another position with the company and provided assistance in that search. By giving Ms. Walden the opportunity to remain employed with the company, "instead of simply terminating her as an at-will employee refusing to fulfill her job responsibilities," *id.* at 502, CSC provided a reasonable accommodation to Ms. Walden.

Moreover, "[w]hile we recognize an employer's duty to reasonably accommodate the religious practices of its employee, we likewise recognize an employee's duty to make a good faith attempt to accommodate [her] religious needs through means offered by the employer." *Beadle*, 29 F.3d at 593 (citations omitted). CSC's proffer of a reasonable accommodation triggered Ms. Walden's accompanying duty to make a good faith attempt to accommodate her needs through the offered accommodation. She failed to comply with this duty when she elected not to apply for any positions within the one-year period.

Ms. Walden contends her layoff with rights was not offered as a reasonable accommodation of her religious beliefs because CSC's policies provide that *all* laid-off employees have access to the company's employment services and the opportunity to be rehired. She relies on *Proctor v. Consolidated Freightways Corp.*, 795 F.2d 1472, 1476–77 (9th Cir. 1986), where the court reversed a district

court's grant of summary judgment after determining the plaintiff had presented sufficient evidence to call into question the employer's motive with respect to accommodating her religious beliefs. *Id*. We are not persuaded by this argument, however, given that CSC specifically elected to lay Ms. Walden off rather than terminate her.

Accordingly, the district court properly granted summary judgment on Ms. Walden's Title VII claim against CSC.

## III.

For the foregoing reasons, we AFFIRM.