[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13513

_____

D.C. Docket No. 1:16-cv-04440-WMR


BATASKI BAILEY,

Plaintiff – Appellant,

versus

METRO AMBULANCE SERVICES, INC.,
d.b.a. American Medical Response, Inc.,

Defendant – Appellee.


_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(April 6, 2021)

Before ROSENBAUM, LAGOA, and ANDERSON, Circuit Judges.

PER CURIAM:

Plaintiff-Appellant Bataski Bailey appeals the district court's order granting summary judgment to Defendant-Appellee Metro Ambulance Services, Inc., doing business as American Medical Response, Inc. ("AMR"), in this Title VII action asserting failure to reasonably accommodate Bailey's religious requirement, discrimination on the basis of religion, and retaliation for filing a discrimination claim. After careful review of the record, we affirm the district court's order.

**I.**

Bailey earned his emergency-medical-technician ("EMT") certification in 2005 and is licensed to practice as a paramedic.

AMR is a private company that offers ambulance services. AMR maintains a contract with DeKalb County to provide both emergency (911) and non-emergency transport services. Non-emergency transport services are scheduled pickups. Nevertheless, they sometimes require "911 urgency." DeKalb County's demand for emergency services "is a little bit greater than" for non-emergency transports.

In mid-2014, Bailey filled out an application online to work at AMR as a "part time paramedic." The application did not specify whether the position would be in emergency or non-emergency transport or both. One of the questions on the application asked, "Have you ever been fired or asked to resign from any job?" The answer reflected on the application was "no."

2

In October 2014, AMR's Human Resources manager Nykia Moore interviewed Bailey, and according to Bailey, he also submitted a paper copy of his employment application to her at that time. On behalf of AMR, Moore testified that the company does not have applicants prepare paper applications, it did not have Bailey fill one out, and she had never seen a paper application filed by any employee at AMR, even though she maintained the personnel files of AMR's local employees. The only paperwork AMR required applicants to prepare, Moore explained, regarded applicants' background and credit-report checks. Those forms did not seek information concerning whether an applicant had been fired by a prior employer.

AMR offered Bailey a position as a paramedic and set January 12, 2015, as his start date. So on January 12, Bailey reported to work for orientation.

When he arrived, Bailey, a practicing Rastafarian, had a goatee as part of his religious practices. Bailey explained that growing facial hair is "seen as sacred and imbuing power to the believer" in Rastafarianism.

At the end of his orientation day, Bailey's training officer, Ellette Jackson, advised him of DeKalb County's grooming policy for emergency transports, with which AMR required compliance for employees conducting such transports. That policy was the DeKalb County Fire Rescue Grooming Policy, and in relevant part, it prohibited "beards, chin whiskers, [and] goatees." Nevertheless, the policy allowed for facial hair below the lip that did "not exceed ½" in any dimension and

3

[did] not breach the inner seal of the [self-contained breathing apparatus] mask." Jackson explained that Bailey's goatee violated the policy.

Bailey responded that he was Rastafarian and had an issue with the policy. Jackson replied that there was nothing he could do about the policy, so they needed to speak with the captain. When they arrived at the office, the captain was not there, so they spoke with Ric Lavallee, the lieutenant.

Following the meeting, Lavallee wrote an email to, among others, Moore. As relevant here, Lavallee noted that Bailey had told him that, in accordance with Bailey's Rastafarian beliefs, he needed to have facial hair. After describing Bailey as "well groomed and presentable[;] however [he] . . . sports a goatee," Lavallee noted that he informed Bailey that the AMR DeKalb emergency-transport grooming policy required the face to be clean shaven, although it did permit a moustache. So Lavallee told Bailey he would have to shave his goatee. Lavallee suggested that if Bailey declined to shave, he could still work non-emergency transports for AMR.

Bailey objected. He said, "You are holding me back," "You are singling me out," and "You are discriminating against me." And he insisted that he was going to work only emergency-transport shifts.

Lavallee disputed that AMR was discriminating against Bailey. He told Bailey that he would still work as a paramedic and would receive the same pay. Then Lavallee said, "It is not going to be any different. The job over there on the

other side is just as important as the 911 side, and you will use your skills just as much or more."

Still later that day, Bailey emailed Moore about the grooming policy. He noted that he had learned his goatee was "not approved by AMR." Then he stated that he was a practicing Rastafarian, and Rastafarianism's traditional requirements demanded he maintain his facial hair. Bailey further explained that he had previously consulted his spiritual leader about how to avoid safety problems while still complying with his religious requirements, and his religious advisor instructed him to "shave what is acceptable to safely function as a paramedic without completely shaving [his] face." Thus, Bailey continued, he had done so by shaving in a way that allowed him to use an N-95 mask and any other respirator-type device without complications. Finally, Bailey opined that AMR's refusal to allow him to work emergency transports with his goatee was "clearly in violation of the [Equal Employment Opportunity Commission's ("EEOC")] guidelines on religious discrimination" and said he hoped to resolve the matter "with no further action."

The next morning, Moore emailed Bailey to ask whether Bailey wanted his email from the night before to serve as his grievance request. Bailey said he did.

Moore forwarded Bailey's email to AMR's in-house Senior Labor and Employment Counsel, Scott Rowekamp. At some point, Rowekamp, who attested that he has a routine practice of "perform[ing] due diligence and fact-gathering"

when he becomes aware of potential litigation, searched Bailey's name on Google "as part of [his] standard due diligence efforts." The first result Rowekamp found linked to a wrongful-termination lawsuit Bailey had filed against one of his previous employers, Rural Metro. After following that link, Rowekamp logged on to PACER to obtain more information about the suit. There, he found a declaration that Bailey had filed in that case. In that declaration, Bailey attested that, "On April 10, 2008, . . . Ms. Riner terminated my employment with Rural Metro."

Concluding that Rural Metro had fired Bailey, Rowekamp determined that Bailey had given a false response on his employment application with AMR. As we have noted, that question asked whether Bailey had ever been fired or asked to resign from any job. And Bailey's AMR application reflected the answer "no." In addition, the application indicated that Bailey had agreed to a certification of his application in which he said he understood that "any false information or omission [in his application] . . . may result in [his] immediate dismissal if discovered at a later date." Before Rowekamp became involved, nothing in Bailey's application had raised any red flags warranting an investigation into falsification.

In the meantime, Moore had continued to offer Bailey, as an accommodation of his religious beliefs concerning grooming, the opportunity to work as a non-emergency paramedic, which would not require him to change his facial hair. Moore had obtained approval for the accommodation from AMR's Human Resources

6

Director, Kate Demitrus, and Rowekamp. Moore also checked with AMR's operations manager about possibly accommodating Bailey's goatee for emergency work, but "he was adamant about the fact that [AMR] adhere[d] to the DeKalb County grooming guidelines, no exceptions." And Moore, who had never previously handled a religious-accommodation request for AMR, did not attempt to ask DeKalb County itself for an accommodation.

Bailey refused the accommodation. He explained that he "d[id]n't feel like [he] should have to settle for th[e non-emergency] position." On January 21, 2015, he sent an email to AMR and advised that he had filed a complaint with the EEOC.

The following day, January 22, Moore received a notification that AMR had no drug-screening results on file for Bailey at the time of his orientation. AMR had a policy that required applicants to pass a "post-offer/pre-placement drug test," and if AMR became aware that it had no drug screening on file for a particular new employee, it required the employee to undergo such a test. Other than post-offer drug screenings, AMR's policy reflected that it drug-tested employees only upon reasonable suspicion of use.

Because Bailey had no drug-screen results on file, Moore removed him from orientation and personally drove him to Quest to take the necessary test. Though that was unusual, it was not unheard of; Moore had driven at least two other employees to drug screenings. Bailey passed the drug test.

As it turned out, Bailey had been scheduled for a drug test on October 29, 2014, before he was employed. Although Bailey claimed to have taken that test, records that Quest, the drug-testing company, provided to AMR indicated that he was a "[n]o [s]how" for that procedure.

On January 30, 2015, Moore met with Bailey. She noted that Bailey's AMR application indicated that he had not previously been fired or asked to resign from any job, but that AMR had discovered a declaration from one of Bailey's prior lawsuits in which Bailey admitted that one of his previous employers, Rural Metro, had fired him. Moore asked Bailey if he had any explanation for the discrepancy.

Bailey responded that he had sued another prior employer, Care EMS, for discrimination after they fired him. Since that time, Bailey stated further, they "removed the termination" "due to wrongful termination." As to his termination from Rural Metro—the former employer Moore had asked about—Bailey directed Moore to his attorney in his lawsuit against that company and stated that his attorney advised him that "this termination d[id] not count as a termination due to it being wrongful." Bailey provided a written statement to this effect, and he signed it. Moore informed Bailey that he was being placed on unpaid administrative leave. Demitrus had decided to place Bailey on unpaid leave because he refused to do non-emergency transport work, and his facial hair continued to violate the DeKalb

8

grooming policy for emergency work, so "essentially there was nowhere for him to go."

At no point during this meeting between Moore and Bailey did Bailey say he had not answered "no" to the question of whether he had previously been fired from another job. During subsequent EEOC proceedings on Bailey's claim, though, Bailey took the position for the first time that he had never answered "no" to that question and instead had explained on his application that he had previously been terminated but that he had challenged those terminations as wrongful.

Later in the day on January 30, Bailey emailed Moore and said that he viewed his "unpaid suspension pending review" as "a thinly veiled attempt to terminate [his] employment" in retaliation for his filing of an EEOC complaint alleging religious discrimination. He further advised AMR that he would be amending his EEOC complaint to add a retaliation claim.

Bailey was officially fired on February 4, 2015, for falsifying his termination status with his previous employer. AMR explained that it took falsification very seriously because honest and accurate documentation is critical for billing government health-coverage programs like Medicare and Medicaid. AMR has also fired others for lying on their employment applications. Indeed, Moore testified that she was not aware of any case where AMR had discovered that a person had not been truthful on his or her employment application and was not thereafter fired.

The EEOC issued a Notice of Right to Sue on September 7, 2016, and Bailey filed the pending action on November 30, 2016. As relevant on appeal, Bailey alleged Title VII claims for religious discrimination, failure to accommodate, and retaliation.

Bailey sought summary judgment on the retaliation claim, and AMR filed for summary judgment on all claims. The magistrate judge issued a report and recommendation recommending the denial of Bailey's motion and the granting of AMR's. Bailey filed objections, but the district court overruled them and adopted the report and recommendation's findings and legal conclusions as the opinion of the court. The clerk of court then dismissed the case.

Bailey timely appealed.

## II.

We conduct de novo review of a district court's order granting summary judgment. *Vessels v. Atl. Indep. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir. 2005). In doing so, we view all evidence and draw all reasonable inferences, in favor of the non-moving party. *Id.* Summary judgment should be granted when the record demonstrates that no genuine dispute exists concerning any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if sufficient evidence would permit a reasonable jury

to return a verdict for the non-movant.  *Evans v. Books-A-Million*, 762 F.3d 1288, 1294 (11th Cir. 2014).

## III.

Bailey argues that the district court incorrectly granted summary judgment to AMR on his disparate-treatment and retaliation claims.  We consider each of Bailey's claims below.

## A.

We begin with Bailey's disparate-treatment claims based on religion.  Title VII prohibits employers from discriminating against their employees on the basis of religion.  42 U.S.C. § 2000e-2(a)(1).  Bailey asserts that he proceeded in the district court under two separate disparate-treatment theories:  a traditional disparate-treatment claim and a failure-to-reasonably-accommodate disparate-treatment claim. We address each in turn.

## 1.

Under the traditional theory, Bailey claims he argued that AMR treated him worse than non-Rastafarians because he was Rastafarian.  In particular, he complains that AMR did not permit him "to work in the position he was hired for," told him "he had to take a position on the [non-emergency transport] side" of AMR's operations, placed him on administrative leave, and later fired him.  And he faults

the district court for not, in his view, adequately applying the "convincing mosaic" framework to analyze his alleged separate traditional disparate-treatment theory.

We disagree that Bailey squarely presented a "convincing mosaic" argument to support his disparate-treatment theory in his summary-judgment briefing in the district court.[1]  True, in his response brief opposing AMR's summary judgment motion before the district court, Bailey cited the "convincing mosaic" theory in connection with his general discussion of the law governing disparate-treatment claims.  He also stated that "[t]his convincing mosaic model will form the foundational argument going forward.  In particular, Plaintiff's Brief for Partial Summary Judgment (Doc 58-1, pp. 14-24) and SECTION V.B. below offer[] direct

---

[1] We have held that the "convincing mosaic" analysis is an alternative to the *McDonnell Douglas* framework for a plaintiff to satisfy her burden to show on circumstantial evidence that her employer discriminated against her.  *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  The *McDonnell Douglas* framework requires a plaintiff to establish a prima facie case of discrimination on the basis of a protected status by showing that (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she was subjected to adverse employment action; and (4) in subjecting the plaintiff to adverse employment action, the employer treated the plaintiff less favorably than a similarly situated individual outside the plaintiff's protected class.  *See id.* at 1325.  For establishing a viable case of protected-status discrimination under *McDonnell Douglas*, the "convincing mosaic" theory can be of particular significance when the plaintiff cannot identify a similarly situated comparator.  *See, e.g., id.*; *see also Rioux v. City of Atlanta*, 520 F.3d 1269, 1281 (11th Cir. 2008).  To make out a prima facie case of retaliation, a plaintiff must demonstrate that (1) she engaged in Title VII-protected activity; (2) she was subjected to adverse employment action; and (3) a causal connection exists between the plaintiff's protected activity and the adverse employment action.  *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020).  We do not appear to have considered in a precedential opinion whether a plaintiff can sustain her burden to establish a circumstantial case of retaliation by relying on the "convincing mosaic" theory, though in unpublished opinions, we have assumed that she can.  We have no occasion to consider that issue here, since on appeal, Bailey abandoned that theory in support of his retaliation claim.  *See Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001).

suspicious timing evidence that would allow a reasonable jury to infer pretext." But the problem for Bailey is that the other briefing to which he referred did not deliver on its promise as it related to Bailey's disparate-treatment claim.

Rather, the cited portions of Bailey's brief for partial summary judgment attempted to assert the "convincing mosaic theory" in conjunction with only Bailey's retaliation claim.[2] In fact, Bailey exclusively advanced his retaliation claim, arguing that AMR's purported reason for the adverse action was pretext for "retaliatory conduct," that there was direct evidence of intentional "retaliation," and that AMR only began digging into his background "in retaliation" for his prior complaints.

The cited portions of his brief opposing AMR's summary judgment motion also did not argue the "convincing mosaic" theory in connection with a traditional religious disparate-treatment discrimination claim. Under a section explicitly referencing only unlawful retaliation, Bailey unsurprisingly argued his retaliation claim, not a traditional religious disparate-treatment discrimination claim. And in line with his retaliation argument, Bailey (mistakenly) contended that "the 'but for' standard" "is not a precondition under the convincing mosaic model." Yet the "but for" standard, which requires a plaintiff to establish that retaliation was the "but for"

---

[2] Even had Bailey continued on appeal to assert his "convincing mosaic" theory in support of his retaliation claim, and assuming without deciding that a "convincing mosaic" theory can be used to establish a retaliation claim, on this record, the "convincing mosaic" theory would not have allowed Bailey to have survived summary judgment on his retaliation claim for the reasons we explain below in our analysis of Bailey's retaliation claim.

13

reason for adverse employment action against him, governs only retaliation claims. And finally, Bailey asserted only that AMR "sought to terminate [him] for engaging in" "an unbroken chain of protected activities," as opposed to on the basis of his protected status (as a Rastafarian).

The clear import of all this briefing is that Bailey argued the "convincing mosaic" theory in the district court in connection with only his retaliation claim—not in conjunction with a traditional religious disparate-treatment discrimination claim. Indeed, in the district court, Bailey's briefing filed before the magistrate judge issued the report and recommendation included not a single specific "convincing mosaic" argument directed at a traditional religious disparate-treatment discrimination claim. And while Bailey tried in his objections to the report and recommendation to assert a "convincing mosaic" argument in support of his traditional disparate-treatment claim, he once again made no specific arguments tying the "convincing mosaic" theory to his disparate-treatment claim. So we find no fault with the district court's conclusion that Bailey "failed to separately address any religious discrimination disparate treatment claim, failed to identify any adverse actions that were based on his religion, and failed to clearly explain that he still maintains a disparate treatment claim separate from his failure to accommodate and retaliation claims."

14

In short, Bailey forfeited any "convincing mosaic" argument in support of his traditional religious disparate-treatment discrimination claim. *United States v. Olano*, 507 U.S. 725, 733 (1993).  And since Bailey made no other argument to support that version of his disparate-treatment discrimination claim, we affirm the district court's grant of summary judgment for AMR on Bailey's traditional religious disparate-treatment discrimination claim.[3]

**2.**

We now turn to Bailey's religious-discrimination claim based on AMR's alleged failure to provide Bailey with a reasonable accommodation of his religious practice of wearing a beard.

The term "religion" in Title VII's prohibition against religious discrimination "includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observation or practice without undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).

---

[3] Nevertheless, we note that had Bailey properly preserved a "convincing mosaic" argument in support of a traditional religious disparate-treatment discrimination claim, we still would have been required to affirm the district court's granting of summary judgment to AMR for the reasons we discuss below as they pertain to Bailey's retaliation claim.  Although the standard differs for a discrimination claim—a plaintiff need show only that discrimination was a "motivating factor" rather than the "but for" cause of the adverse employment action—on this record, we conclude that no reasonable juror could find that an intent to discriminate because Bailey was a Rastafarian was a motivating factor in AMR's decisions to drug-test, suspend, and fire Bailey.

The Supreme Court has recently emphasized that an employer's "mere neutrality with regard to religious practices—that they be treated no worse than other practices"—is not enough. *EEOC. v. Abercrombie & Fitch Stores, Inc.,* 135 S. Ct. 2028, 2034 (2015). Instead, the Supreme Court has explained, Title VII gives religious practices "favored treatment, affirmatively obligating employers not to fail or refuse to hire or discharge any individual because of such individual's religious observance and practice." *Id.* (cleaned up).

To establish a reasonable-accommodation claim of religious disparate treatment, a plaintiff must first set forth a prima facie case by showing that (1) his sincere and bona fide religious belief conflicted with an employment requirement, and (2) his employer took adverse employment action against him because of his inability to comply with the employment requirement or because of the employer's perceived need for his reasonable accommodation. *See Abercrombie*, 135 S. Ct. at 2033.[4] We have recognized that a plaintiff's burden to establish a prima facie case "is not onerous." *Walden v. Ctrs. for Disease Control & Prevention*, 669 F.3d 1277, 1293 (11th Cir. 2012) (citation and quotation marks omitted).

---

[4] *Abercrombie* clarified that an employer need not have "actual knowledge" of an applicant's or an employee's need for accommodation if the employee can show that his need for an accommodation was a motivating factor in the employer's adverse employment action. 135 S. Ct. at 2032-33. To account for *Abercrombie*, the test set forth above modifies what we have previously stated as the framework for evaluating religious reasonable-accommodation claims. *See, e.g. Morrissette–Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1321 (11th Cir. 2007) (requiring prior to *Abercrombie* that the employee informed her employer of her belief and that she was discharged for failing to comply with the conflicting employment requirement).

Once a plaintiff makes out a prima facie case, the burden shifts to the employer to show that it either offered a reasonable accommodation or that it cannot reasonably accommodate the employee's religious practice without undue hardship on its business.[5] *See Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1986).  If an employer establishes that it offered a reasonable accommodation for the employee's religious practice, it is entitled to judgment in its favor.  *See id.*  The employer has no further obligation to offer an employee's preferred accommodation or to demonstrate that an employee's preferred accommodation would cause an undue hardship.  *Id.*

Here, our inquiry centers on whether AMR established that it offered Bailey a reasonable accommodation.  A "reasonable accommodation" "eliminates the conflict between employment requirements and religious practices."  *Ansonia*, 479 U.S. at 70.  Although we evaluate offered accommodations on a case-by-case basis, *Beadle v. Hillsborough Cnty. Sheriff's Dep't*, 29 F.3d 589, 592 (11th Cir. 1994), whatever else may qualify, a transfer to a "comparable position" that removes the conflict between the policy and the religious practice, and reasonably preserves the

---

[5] In the past, we have described the employer's burden as a requirement that it establish it was "unable to reasonably accommodate . . . an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." *Walden*, 669 F.3d at 1293 (citation and internal quotation marks omitted).  While that is a correct statement, it is not a complete one.  It does not account for situations like the one here, where the employer purported to reasonably accommodate the employee's religious practice.  For that reason, we supplement our prior statement of the employer's burden with the statement above, which accounts for cases where the employer claims to have offered a reasonable accommodation.

employee's terms, conditions, or privileges of employment, satisfies the reasonable-accommodation requirement. *See Ansonia*, 479 U.S. at 71; *see also EEOC v. United Parcel Serv.*, 94 F.3d 314, 318-20 (7th Cir. 1996).

AMR offered Bailey a reasonable accommodation. It provided Bailey with the opportunity to maintain his beard and to work on the non-emergency-transport side of its operations, for which DeKalb County's facial-hair policy did not apply. Had Bailey accepted the offer, his salary, hours, and job description would have remained the same as if he had worked either exclusively on the emergency side or on both the emergency and non-emergency sides of AMR's operations. As a result, his terms and conditions of employment would not have been affected by the accommodation AMR offered.

We are not persuaded by Bailey's arguments to the contrary. Bailey suggests that his hours—and therefore his pay—would have been reduced had he worked solely on the non-emergency-transport side. He also claims that non-emergency transport is less desirable because it involves less skill, less community involvement, and "mundane" tasks. And finally, Bailey contends that working only non-emergency transport would have limited his ability to obtain supervisory positions, since according to Bailey, those positions generally required three years of emergency experience. But Bailey does not submit sufficient evidence to create a material issue of fact concerning these matters.

18

With respect to hours and pay, Bailey relies on the fact that AMR had fewer non-emergency shifts than emergency shifts to contend that he would not have been able to obtain the same number of non-emergency work shifts as emergency ones. But Bailey points solely to the availability of non-emergency-transport hours for his entire class of trainees, not on the availability of non-emergency transport hours for employees who had completed orientation and could work only non-emergency transport. And AMR did not have so few non-emergency work shifts that it could not keep Bailey fully employed in his paramedic position. Indeed, Moore testified that AMR had sufficient work to have allowed Bailey to carry a full load of non-emergency transport hours. And Jackson attested that AMR ran between fifteen and twenty-five non-emergency trucks per week.

Bailey also asserts that non-emergency-transport paramedics were not eligible for bonuses that emergency-transport paramedics could receive. But in fact, AMR did not offer stipends to paramedics as incentives for picking up additional shifts at the time Bailey worked there. And in 2016, when AMR began offering such stipends, both emergency and non-emergency paramedics were eligible. So we find insufficient evidence of record to support Bailey's claim that he would have worked fewer hours or received lower pay had he accepted AMR's accommodation.

As for the nature of non-emergency transport, Bailey complains that the work was not as important as emergency transport and instead involved "granny totes,"

19

though Bailey was fired before completing orientation and working as a non-emergency paramedic. But Lavellee told Bailey, "It is not going to be any different. The job over there on the other side is just as important as the 911 side, and you will use your skills just as much or more." And Jackson—who trained paramedics that AMR hired—testified that non-emergency and emergency transport for AMR required the same skills. In fact, according to Jackson, the non-emergency side served "a lot . . . more sick people" and ran "more emergency calls." Moore also attested that non-emergency transports involved "critically ill patients" of all ages "who require continuous monitoring and interventions." So non-emergency paramedics "must be . . . able to respond to issues that may arise while transporting patients on ventilators, sedated patients, patients who have suffered spinal cord and/or brain injuries, and high risk obstetric and pediatric patients." Bailey did not contest these statements. On this record, the district court did not err in concluding that the emergency and non-emergency positions required essentially the same skills and work.

As for career-mobility concerns, Bailey contends that to advance to a supervisory position, paramedics need three years of emergency-paramedic experience. But Bailey already had supervisory experience when he joined AMR, having served as a supervisory paramedic for nearly two years at Six Flags Over Georgia and as a paramedic supervisor for two years for CARE EMS. And Moore

20

attested that while AMR supervisors must have two years of experience as a paramedic, AMR does not require that experience to be on the emergency side. So Bailey's concerns fail to materially dispute AMR's evidence that serving on the non-emergency side will not negatively affect Bailey's future career prospects.

For these reasons, we conclude that the district court correctly held that AMR offered Bailey a reasonable accommodation. And since that is the case, the inquiry ends at this point, and the district court properly entered summary judgment for AMR.

**B.**

Next, we address Bailey's retaliation claim. For a retaliation claim that relies on circumstantial evidence, like this one, we apply the *McDonnell Douglas*[6] burden-shifting analysis. *Johnson*, 948 F.3d at 1325.

Under that framework, the plaintiff establishes a prima facie case of retaliation if he demonstrates (1) he participated in a statutorily protected activity; (2) he experienced an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. *Id.* If the plaintiff makes out a prima facie case, the burden shifts to the defendant to come forward with a legitimate, nondiscriminatory reason for its employment decision. *Id.* And if the defendant does so, the burden shifts back to the plaintiff to show that the defendant's stated

---

[6] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

reason was not the real reason for its decision but rather, served as a pretext for retaliation. *Id.* Significantly, when it comes to retaliation claims, a plaintiff must demonstrate that his participation in protected activity was the "but-for" cause of the adverse employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). Unlike with a claim of discrimination on the basis of a protected status under Title VII, it is not enough to show simply that retaliation was a motivating factor among others in the adverse action. *Id.*

Under this framework, Bailey's retaliation claim necessarily fails. Bailey alleges he was fired for participating in protected activity in the form of his prior lawsuit against his previous employer, Rural Metro. He bases his theory on Rowekamp's discovery of Bailey's affidavit filed in the Rural Metro litigation. As we have mentioned, in that affidavit, Bailey acknowledged that Rural Metro had fired him and asserted that it had done so for discriminatory reasons. Certainly, if AMR terminated Bailey's employment because it learned he had engaged in protected activity in a prior job, that would constitute retaliation under Title VII. After all, Title VII prohibits an employer from discriminating against an employee or applicant because he "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a). By its plain language, Title VII does not require retaliation to be based on protected activity engaged in against the defendant employer.

22

But here, Bailey has not demonstrated that his participation in Title VII-protected activity was the but-for cause for AMR's termination of him. Even assuming without deciding that Bailey can establish a prima facie case of retaliation, the record reflects that AMR fired Bailey because it concluded he lied on his employment application when he stated that he had never been fired from another job.

To be sure, AMR discovered what it deemed to be Bailey's lie by reviewing Bailey's declaration from his Title VII litigation against Rural Metro, and Bailey's participation in that litigation was protected conduct. But that AMR learned of Bailey's alleged lie by reviewing a document filed in Title VII litigation does not mean that it terminated him for engaging in the litigation. Our review of the record yields no evidence that AMR fired Bailey because Bailey sued Rural Metro for alleged discrimination.

Rather, the evidence supports AMR's assertion that it ended Bailey's employment because it thought Bailey had lied on his application, since his sworn declaration in the Rural Metro case stated that Rural Metro had fired him, yet Bailey's AMR application indicated that he had never been fired. Indeed, all evidence shows that AMR had a policy of firing employees it discovered had been untruthful on their applications.

23

Moore testified that in all the cases she has been involved with, no one who has lied on an application has ever not been fired. She also identified other AMR employees who met the same fate as Bailey when AMR learned they had lied on their applications. Rowekamp likewise testified that AMR fired any employee it learned had lied on the application. And AMR's employment application itself alerts all applicants that "any false information or omission [in his application] . . . may result in [his] immediate dismissal if discovered at a later date." Similarly, AMR's employee handbook warns that "[d]ishonesty" or "[f]alsification of . . . employment application, regardless of discovery date," "may lead to immediate termination." In light of this undisputed evidence, AMR established that it fired Bailey for a legitimate, nondiscriminatory reason.

Bailey's efforts to create a material issue of fact concerning pretext lack merit. First, he claims a material issue of fact exists over whether the application AMR relied on in concluding Bailey had lied on his application was, in fact, the application that Bailey filled out. Preliminarily, we note that even if the application were not the correct one, that is not an issue of consequence unless AMR had reason to know that it was not representative of Bailey's application. And here, we conclude that no reasonable jury could find that AMR did not believe that the application it relied on was not Bailey's. *See Hammett v. Paulding Cnty.*, 875 F.3d 1036, 1049 (11th Cir. 2017) ("The fact that the record contains anything at all in support of the

24

nonmovant's position is not dispositive; a 'genuine' dispute requires that the evidence is such that a reasonable jury could find for the nonmovant.").

Bailey points to his testimony that he prepared a handwritten application, and on that application, he disclosed that he had been terminated by a prior employer. He also notes that the application AMR relied on was a computer printout that, among other things, contained information in fields into which only AMR employees could enter data. On this record, this evidence is not enough to create a material issue of fact.

First and most significantly, at no time while Bailey was still employed by AMR did he so much as suggest that he had disclosed in his application that he had previously been fired. In fact, he did not do so even when directly confronted with the allegation that he had lied on his application by answering "no" to the question about prior terminations.

Instead, he did the opposite: he explained why he thought answering "no" was not untruthful. He said his attorney told him that since he was contesting the termination as unlawful, it did not count. That explanation necessarily contradicts Bailey's current claim that he did not answer "no" on his application.

The first time Bailey ever claimed not to have answered "no" was in the post-termination EEOC proceedings. For this reason alone—even setting aside the question of whether Bailey fabricated the existence of an application that disclosed

his prior terminations—AMR reasonably relied on the only application Moore attested AMR had on file for Bailey. *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (noting that the pretext inquiry is whether the employer had an honest belief, "evenly if mistakenly or unfairly so," that the employee violated a company policy).

But there's more. Bailey attempts to explain his failure to tell Moore—or anyone else at AMR throughout the time of his employment—that he had not responded "no" by saying that he was not shown the application at the time of his meeting with Moore. Even without considering Moore's testimony to the contrary, this excuse fails to explain why Bailey—who obviously knew what he wrote in his own application—would have told Moore why he answered "no" if he, in fact, had never done so. When a party later contradicts his own statements of record without any valid explanation for the contradiction, that party fails to raise a genuine dispute of fact. *Cf. Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010) ("A court may determine that an affidavit is a sham when it contradicts previous deposition testimony and the party submitting the affidavit does not give any valid explanation for the contradiction.").

And contrary to Bailey's post-termination statements that, for the first time alleged he had filled out a paper application in addition to an online one, Moore, who maintained personnel files for AMR, testified that AMR never used paper

26

applications in the several years she worked there. As for handwritten documents that AMR collects from applicants, the record reveals that only the background and credit-check applications (as opposed to the employment application) fall into that category. So even assuming Bailey's assertion that he filled out a second, handwritten application, Bailey has not presented any evidence that AMR knew he had done so and failed to consider it.

And with respect to the online application, that AMR employees filled in AMR-employee-only fields (such as "[b]ackground [c]heck [d]ate [r]eceived") after the applicant filled out his parts, does not somehow render invalid or unreliable the portions the applicant prepared—especially in light of Bailey's implicit concession to AMR (in his own handwriting) that he answered "no" on the application to the question of whether he had previously been fired.

Bailey also contends that AMR's decision to fire him for lying on his application was pretextual because he told AMR that his attorney advised him that he had not really been terminated, and Bailey provided his attorney's number to AMR. Bailey claims that AMR's failure to call his attorney demonstrates that AMR's termination was pretextual.

We disagree. Bailey was terminated from his prior employment—a fact he knew, having sworn to that effect in his declaration in the Rural Metro litigation. That Bailey contested the firing as wrongful did not mean he was not fired in the

27

first place.  Under these circumstances, AMR had no obligation to contact Bailey's

attorney to learn the details of Bailey's lawsuit against Rural Metro before firing him

for lying about having been terminated by Rural Metro.[7]  *See Alvarez,* 610 F.3d at

1266.

Bailey's assertion that the context in which he was drug-tested somehow

shows that his firing was a pretext for retaliation likewise fails.  Bailey claims that

he underwent drug-testing in October 2014, and he had already started orientation at

AMR, so there was no basis under AMR's policies for AMR to drug-test him a

second time in January 2015.

But the record reflects that AMR had a policy of drug-testing all employees

in connection with their hiring.  And while it tried to do so before the employees

began orientation, when that did not occur, AMR drug-tested its employees soon

after they began working at AMR.  Moore testified that when she received

information that a new hire had not yet been drug-screened, she routinely arranged

for him to be tested.

In Bailey's case, though Bailey claimed to have undergone testing, Quest, the

company that was supposed to have performed the drug-screening, provided AMR

with a record reflecting that Bailey had not showed up for his scheduled drug-test in

---

[7] While we do not consider it here, as a matter of fact and in fairness to Rural Metro, the district court subsequently dismissed Bailey's case against Rural Metro.

October 2014. That document is a part of the record in this case, and Bailey has not provided any evidence to suggest AMR either actually had received drug-screening results for Bailey or did not believe it needed a new-hire drug-test from Bailey in January 2015. As for the fact that Moore drove Bailey to Quest for the test, that likewise does not somehow make the reason for the test suspect. Indeed, though Moore did not do it often, she also drove other new hires for drug-tests when their files indicated no results at the time of orientation.

Bailey also takes issue with Rowekamp's Googling of him. Rowekamp testified that, as legal counsel for AMR, whenever he became aware of possible litigation, he routinely performed what he referred to as "due diligence," Googling those involved. To the extent Bailey asserts that Rowekamp's Googling of his name and follow-up review of his declaration in the Rural Metro litigation were, in and of themselves, retaliation, we disagree. Bailey points to no way in which these limited actions themselves—which any member of the public can legally and easily perform—materially changed the terms or conditions of Bailey's employment and therefore constituted adverse actions for Title VII purposes.

And to the extent that Bailey argues that Rowekamp's actions are evidence of pretext, that contention, too, fails. First, nothing in the record suggests that, as counsel for AMR, Rowekamp does not, in fact, Google anyone who threatens legal action against the company. Nor is there anything inherently unlikely about

29

Rowekamp's testimony in this regard. And second, even if we assumed an improper motive, the fact remains that the but-for reason for Bailey's termination was AMR's belief that Bailey had lied on his employment application.

While Bailey argues that Rowekamp's Googling was the but-for cause of his termination, we cannot agree. Had Rowekamp found no evidence that Bailey had lied on his AMR employment application, there is no indication that Bailey would have been fired, merely because Rowekamp had Googled his name and reviewed a resulting lead. Rather, the record indicates that the but-for cause of Bailey's termination was AMR's belief that he had given an untrue answer on his employment application, so Bailey's retaliation claim necessarily fails. *See Nassar*, 570 U.S. at 360.

## IV.

For the foregoing reasons, we affirm the district court's entry of summary judgment for AMR.

**AFFIRMED**.

ROSENBAUM, Circuit Judge, concurring:

I agree that the district court correctly entered summary judgment for AMR for the reasons set forth in the opinion. I write separately to observe only that some tension may exist between the language of 42 U.S.C. § 2000e(j) and *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2033 (2015), on the one hand, and *Ansonia Board of Education v. Philbrook*, 479 U.S. 60, 70 (1986), on the other.

Under *Ansonia*, once an employer offers a solution that would qualify as a "reasonable accommodation," it need not consider any other proposed reasonable accommodation, even if another proposed accommodation would not cause undue burden—or even any burden—and even if it more closely aligns with the employee's original job description and duties. *See Ansonia*, 479 U.S. at 68. That is because of the play in the joints in the language "terms, conditions, or privileges of employment" found in 42 U.S.C. § 2000e-2(a)(1), which makes it unlawful to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's . . . religion." Under the case law, employers have some discretion and flexibility in what they can offer before their offer is deemed to materially affect the "terms, conditions, or privileges of employment."

Meanwhile, Section 2000e(j) defines "religion" to "include[] all aspects of

31

religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).  Significantly, the Supreme Court has observed that Title VII "does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices.  Rather, it gives them favored treatment, affirmatively obligating employers not ['otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment'] . . . because of such individual's' 'religious observance and practice.'" *Abercrombie*, 135 S. Ct. at 2034.

Here, AMR offered Bailey the ability to keep his beard and work exclusively on the non-emergency side of its operations.  While this certainly qualifies as a reasonable accommodation under our case law, the fact remains that because of a religious practice, paramedics who were fully qualified to work emergency transport could be entirely precluded from doing so, even though allowing them to work emergency transport would not have imposed undue burden or, apparently, even any burden at all on AMR.

Three facts in the record demonstrate that permitting paramedics like Bailey to work emergency transport would not have unduly burdened AMR.  First, the refusal to allow Bailey to work on the emergency-transport side was not for a safety

reason, as Bailey could demonstrate a complete seal with his short beard and an N-95 mask. Rather, it was solely to comply with DeKalb County's grooming code. But second, Moore did not so much as ask DeKalb County for a waiver from its grooming policy to allow Bailey to work on the emergency-transport side. And third, a couple years after Bailey was terminated, when AMR did ask DeKalb County whether it would be willing to permit those with short beards to work emergency transport, DeKalb County authorized it.

But although later events suggest that allowing Bailey to have worked on the emergency-transport side while retaining his beard apparently would not have burdened AMR at all,[1] *Ansonia* condones AMR's preclusion of Bailey from the emergency-transport side of operations, since he would have retained the same pay and general work on the non-emergency-transport side only. That seems to create some friction with *Abercrombie*'s caveat that "mere neutrality" is not enough and that religious practices are entitled to "favored treatment." Indeed, even though AMR's accommodation here satisfied the "reasonable accommodation" requirement, it nonetheless clearly excluded Bailey from more than half of AMR's

---

[1] Moore testified that in January 2015, at the time AMR offered Bailey the reasonable accommodation of working non-emergency transport only, AMR did not ask DeKalb County whether it would be willing to make an accommodation for a beard. Rather, that did not occur until more than two years later, in the spring of 2017, when AMR had new leadership in its DeKalb County operations. For this reason, there is no indication that Bailey was treated worse than others with beards during the relevant timeframe or by Moore's supervisor, when AMR offered to allow him to work non-emergency transport only.

33

operations, solely because of his religious practice, and even though allowing Bailey to work on the emergency side apparently would not have burdened AMR. In strict terms, that seems like "otherwise . . . discriminat[ing]" on the basis of a religious practice, even if AMR's accommodation qualifies as not materially affecting the compensation, terms, conditions, or privileges of employment.

While it's one thing to allow a difference in treatment that does not materially alter the "compensation, terms, conditions, or privileges of employment" and that would impose an undue burden (in violation of Section 2000e(j)), it seems quite another to condone it when there's a way to avoid a difference in treatment without causing any burden. Under the *Ansonia* framework, though, the religious-accommodation inquiry ends once *any* reasonable accommodation is made. So an employer need not offer alternative accommodations that better align with the employee's original job duties, even if they cause the employer no undue hardship. Though *Abercrombie* was not about selecting among reasonable accommodations, this circumstance still seems inconsistent with *Abercrombie*'s concern that religious practices receive "favored treatment."

Nevertheless, I am aware that *Abercrombie* did cite *Ansonia* for an unrelated proposition. *See Abercrombie*, 135 S. Ct. at 2041. And the Supreme Court "does not normally overturn . . . earlier authority *sub silentio*." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000). So although it seems to me that Section

34

2000e(j)'s definition of "religion" and the Supreme Court's concern for religion's "favored treatment" as reflected in *Abercrombie* tend to support the notion that an employer must make a preferred reasonable accommodation if it does not cause the employer undue burden, *Ansonia* clearly is not consistent with such a notion.

For these reasons, I concur in the panel opinion. But I note my concerns regarding the unique category of cases like this one—where an alternative reasonable accommodation exists that better aligns with an employee's original job duties and description and does not unduly burden the employer. In this limited category of cases, to be consistent with the import of Section 2000e(j) and the idea expressed in *Abercrombie* that religious practices enjoy more than "mere neutrality," perhaps it makes sense to reconsider *Ansonia*'s application.

35