[DO NOT PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 21-10638

_____

AUDREY CINDERELLA THOMAS,

Plaintiff-Appellant,

*versus*

JENNIFER ESTERLE,
KIM ZUKOWSKI,
RGH ENTERPRISES, INC.,

Defendants-Appellees.

————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:18-cv-00686-SCJ

————————————

Before WILLIAM PRYOR, Chief Judge, LUCK, and ED CARNES, Circuit Judges.

PER CURIAM:

Audrey Cinderella Thomas appeals the grant of summary judgment against her in her 42 U.S.C. § 1981 lawsuit in which she raised claims of racial discrimination, harassment, and retaliation against her former employer, RGH Enterprises, and two of her supervisors (collectively "RGH"). Because the parties and district court are familiar with the record and procedural history, we will largely confine our discussion in this unpublished opinion to the reasons we are affirming the district court's judgment.

## I. The Retaliation Claim

We begin with the retaliation claim, which Thomas spends most of the argument section of her brief talking about. Section 1981 protects an employee from adverse action by her employer because she engaged in protected conduct. See CBOCS W., Inc. v. Humphries, 553 U.S. 442, 451–52 (2008) (holding that § 1981 encompasses retaliation claims); Bryant v. Jones, 575 F.3d 1281, 1307–08 (11th Cir. 2009) (holding that a retaliation claim under

§ 1981 is analyzed under the same framework as a retaliation claim under Title VII); *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir.1998) (stating that Title VII and § 1981 "have the same requirements of proof and use the same [*McDonnell Douglas/ Burdine*] analytical framework"), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Protected conduct includes opposition to any practice prohibited by the statute, and participation in any investigation or other proceeding to enforce rights under the statute. *See* 42 U.S.C. § 2000e-3(a).

Putting aside the question of whether Thomas has properly preserved and presented her retaliation claim, the district court correctly reasoned that the claim failed on the merits anyway because of her failure to offer any evidence that she engaged in any protected conduct that was a "but-for" cause of any adverse action. *Bailey v. Metro Ambulance Servs., Inc.*, 992 F.3d 1265, 1277 (11th Cir. 2021) ("Significantly, when it comes to retaliation claims, a plaintiff must demonstrate that his participation in protected activity was [a] 'but-for' cause of the adverse employment action.") (bracketed word altered from "the" to "a" to comply with *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020)); *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016); *see Bryant*, 575 F.3d at 1307–08 ("[A] plaintiff alleging retaliation must first establish . . . a causal link between the protected activity and the adverse action.").

Thomas contends that keeping a notebook about what she perceived to be the unlawful or unfair conduct of RGH was protected conduct.  We have serious doubts about that, but even if it were protected conduct she cannot satisfy the causal link requirement with the notebook. The notebook was confiscated, either intentionally or inadvertently, from her *after* the decision was made to terminate her.  There is no genuine issue of material fact about whether any decision maker knew before then that she was keeping notes about what she perceived to be unfair or unlawful treatment.

All that the record reveals about any supervisor or decision maker knowing anything about Thomas' notebook is that she referred to it when attempting to explain to her supervisor why the second of her five policy violations had occurred.  In that conversation, Thomas referred to having written in "my notebook" how her computer had frozen and she had asked another employee to take care of the call, but that other employee had not done so. Thomas testified that she offered to let her supervisor see what she had written in her notebook about those events, but the supervisor didn't look at it.  In any event, the notes Thomas had made about her computer freezing up did not oppose any unfair or unlawful treatment or amount to participation in a § 1981 proceeding. Nor did she say anything that would have led her supervisor to believe the notebook was about protected conduct or that itself amounted to protected conduct.  And, to repeat, the supervisor did not look at the contents of the notebook.

Absent proof that any supervisor or decision maker knew about the contents of the notebook before Thomas was fired, it could not have been the motivation for her being fired. Unwitting retaliation is an oxymoron in the law, just as it is in the common understanding of the word "retaliate." *See Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999) ("At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected [activity] at the time it took adverse action.") (quotation marks omitted). Summary judgment was proper on the retaliation claim.

Thomas' spoliation argument adds nothing to her retaliation claim. Spoliation concerns the loss or destruction of evidence that prejudices a party. Nothing that was in the lost or destroyed notebook could possibly have prejudiced Thomas on the retaliation claim because nothing in the notebook could have been evidence that RGH knew the contents of the notebook and fired her because of those contents. Thomas is the one who wrote in the notebook, not RGH or any of its other employees. And there is no evidence that anyone other than Thomas knew it contained anything about protected conduct until after the decision to terminate her had been made.

## II. The Discriminatory Termination Claim

Thomas also contends that the district court erred in granting RGH summary judgment on her discriminatory treatment claim. That claim was about termination of her employment after she was cited for violations of policy (sometimes referred to as

"compliance occurrences") on five occasions from February through June of 2016.  Those citations grew out of standard office procedure recordings of her telephone conversations with RGH's customers, which conversations were the primary part of her job.

In keeping with RGH's disciplinary procedures, the first two violations resulted in verbal warnings, and the next two resulted in written warnings and in a "Corrective Action Form" that she was presented and required to sign.  Her fifth violation resulted in the termination of her employment.

Thomas contends that none of the five compliance occurrences was justified and that at least some of them were contrary to how she had been trained.  RGH responds that they were all fully justified and not contrary to her training.   In that regard, the first and fourth ones are particularly relevant. The first compliance occurrence and verbal warning grew out of a phone conversation in February of 2016 in which Thomas failed to confirm a Medicare patient's date of birth.  Thomas argued that she had been told during her training for the job that it was not necessary to ask for a Medicare patient's date of birth.  Her supervisor insisted that it was necessary.

The record contains a written "Acknowledgement Form" signed by Thomas that certifies the training she received on November 5, 2015, "covered the three critical requirements listed below" the first one of which is that "It is mandatory with each call" that she validate who she was speaking to "along with the patient's name and date of birth or address."  The form also certifies that

Thomas understood: "the importance of adhering to the requirements listed above and that failure to follow the necessary steps to meet these requirements will result in corrective action(s), up to and including termination." Thomas does not contend that in the phone conversations leading to either the first or fourth compliance occurrence that she asked for the patient's date of birth or address.

Although Thomas disagreed with her supervisor about what was required, as the magistrate judge put it, she "eventually gave up trying to convince her." And there is no dispute that her supervisor's instruction in February of 2016 made clear to Thomas that her supervisor insisted she ask for every Medicare patient's date of birth.

Despite that clear instruction she received from her supervisor after the first compliance occurrence in February of 2016, three months later (on May 17, 2016), she again failed to confirm a Medicare patient's date of birth, resulting in her fourth compliance occurrence. (Her third compliance occurrence, which had resulted in her first written warning, had been for her third violation; that one was for violating a different policy requirement.) And once again, Thomas tried to convince her supervisor she had been trained that it was unnecessary to obtain a Medicare patient's date of birth. Her supervisor again instructed her it was necessary and issued Thomas a second and final written warning.

That second and final warning was memorialized in a "Corrective Action Form" Thomas and her supervisor signed on May

26, 2016. The form warned Thomas that "Further violation of any Company policy will result in additional corrective action up to and including termination of employment." The form also included Thomas' acknowledgement that "if there is not an immediate and sustained improvement satisfactory to the Manager (and/or Human Resources)[,] further disciplinary action will be taken up to and including termination."

Despite the clear warnings and her acknowledgement of them, Thomas' fifth violation came the very next month. She was the subject of a compliance occurrence for not properly verifying the quantity of medication that a caller had remaining before she proceeded with the order.

Following that fifth violation, and after reviewing Thomas' disciplinary history and consulting with the HR department, her supervisor terminated Thomas' employment, citing what she described as her repeated failures to comply with RGH policy.

The *McDonnell Douglas* framework applies in § 1981 cases. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Thomas has not identified a similarly situated comparator outside her protected class who was treated more favorably than she was. Nor has she shown that RGH's stated reason for firing her — her disciplinary history of five violations of RGH policy and requirements — was pretextual. "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet [it] head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that reason." *Alvarez v. Royal Atl.*

*Devs. Inc.*, 610 F.3d 1253, 1265–66 (11th Cir. 2010) (second alteration in original). A series of repeated violations of company policy, five in a four-month period, is a reason that might motivate a reasonable employer to take disciplinary action up to and including terminating the repeat-offender employee.

Thomas' argument that the violations were frame-ups because she did nothing inconsistent with her training, is unpersuasive. As we have explained, her fourth violation was a repeat of the first one. And after she attempted to excuse the first violation as consistent with her training, and argued that it was, her supervisor instructed her that it was not consistent with company policy. Thomas was specifically warned on that occasion that it was not acceptable. Yet, she committed exactly the same violation three months later. Insubordination does not excuse violations, it compounds them.

And there is the additional fact that Thomas' second violation had resulted from her failure to disclose to a customer that a call would be recorded. She does not contend that failure was consistent with her training. And neither has she presented a convincing mosaic of circumstantial evidence that she was fired because of her race. *See generally*, *Smith v. Lockheed Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

### III. The Racially Hostile Environment or Harassment Claim

Thomas' claim that she was subjected to a racially hostile work environment fails for a number of reasons. Her argument

that racial harassment was established or supported by the fact that she was disciplined for bogus reasons is unconvincing. First, as we have just explained, Thomas was disciplined for non-bogus reasons—violations of company policy. Second, in any event, a claim of an adverse employment action, such as termination, must be brought as a separate discrimination or retaliation claim, not as part of a hostile-work-environment claim. *See McCann v. Tillman*, 526 F.3d 1370, 1378–79 (11th Cir. 2008).

Thomas also failed to show that the matters about which she complains were racially focused, based, or motivated, and that they were severe or pervasive. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1297–99 (11th Cir. 2012). To prevail on a racially hostile environment claim, "a plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008); *accord Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002); *McCann*, 526 F.3d at 1379. She has not done that.

The district court properly granted summary judgment to RGH on the racially hostile environment claim.

## IV. Conclusion

21-10638                Opinion of the Court                11

AFFIRMED.[1]

---

[1] This case was originally scheduled for oral argument, but under 11th Cir. R. 34–3(f) it was removed from the oral argument calendar by unanimous consent of the panel.